2021 IL App (1st) 181984

No. 1-18-1984

Opinion filed May 5, 2021

Third Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 CR 3738 |
| | ) | |
| DIAMOND LITTLE, | ) | Honorable |
| | ) | Matthew E. Coghlan, |
| Defendant-Appellant. | ) | Judge presiding. |

_____

JUSTICE BURKE delivered the judgment of the court, with opinion.
Presiding Justice Howse and Justice McBride concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a bench trial, the trial court convicted defendant of attempt first degree murder and sentenced him to 30 years' imprisonment. Defendant appeals, arguing that (1) the trial court erred in failing to hold a full hearing with new counsel, after a preliminary inquiry under *People v. Krankel*, 102 Ill. 2d 181 (1984), on defendant's *pro se* posttrial motion alleging ineffectiveness of trial counsel and (2) the trial court improperly admitted into evidence defendant's recorded jail

phone calls in the State's rebuttal case because they lacked adequate foundation. For the following reasons, we affirm defendant's conviction.

¶ 2                                         I. BACKGROUND

¶ 3       Defendant was charged by grand jury indictment with 12 counts of attempted first degree murder, 2 counts of aggravated battery, and 1 count of aggravated discharge of a firearm. The charges arose out of an incident on the night of February 2, 2017, when defendant fired shots at Quenten Clark's residence in south Chicago, injuring Malaka Johnson and Michael Harris. Prior to trial, the State elected to proceed on only 5 counts of attempt first degree murder along with the other offenses and nol-prossed the remaining counts of attempt first degree murder.

¶ 4                                         A. Trial Evidence

¶ 5        At trial, Johnson testified that she was 25 years old at the time of the trial and had prior convictions for fleeing and eluding and possession of a stolen motor vehicle. In February 2017, she was living with her mother on the west side for Chicago and attending Malcolm X College. On February 2, 2017, Johnson got into an argument with her mother and took a bus to visit her ex-boyfriend, Clark, who lived near 63rd Street and Rockwell Street on the south side of Chicago. Johnson testified that she frequently stayed with Clark, who lived with his mother, sister, and father. She testified that she exited the bus, went to Clark's house, and knocked on his door, but Clark's sister informed her that Clark was not home. She does not remember anything else after that. She later woke up in the hospital and learned she had been shot in the back of her head and in her back. As a result, she was blind in her right eye. She was in the hospital for one month and then moved to a rehabilitation facility for therapy to assist with regaining movement and speech and adapt to the loss of vision. After being in the rehabilitation facility for two weeks, she moved back to her mother's house. The bullet in her back worked its way out after she got home. She

testified that her memory is "very messed up" because of the shooting and she did not return to college due to her vision loss. She does not remember Clark being at his house on the night she was shot.

¶ 6        Harris testified that he was 35 years old at the time of trial and was working for a temp agency. He has a prior conviction for possession of a controlled substance and delivery of a controlled substance. He testified that he was at Clark's house on the night of February 2, 2017, with the mother of his child, who was Clark's sister. He arrived at 10 or 11 p.m. Harris testified that Clark left the house around midnight to go to the liquor store nearby. Harris was inside watching a basketball game on the television when Clark returned. The doorbell rang; it was Johnson, Clark's ex-girlfriend. Clark went outside. Harris testified that he could hear Clark and Johnson arguing on the front porch. Harris went to the window and saw them outside. Harris testified that he then went toward the front door because he was about to go home, but Clark came inside at the same time. Clark pushed Harris in slightly and slammed the door. At the same time, Harris heard "a shot go off and I felt something hit me." Harris heard four or five gunshots total. The first gunshot occurred while Clark was still outside. Harris realized he had been shot in his right arm; he and Clark ran to the back of the house until the gunshots stopped.

¶ 7        When they returned to the front of the house, Harris observed Johnson laying on the front porch and bleeding from her head. Harris testified that Clark stated, "Oh, man, he shot Makala, he shot Makala." Clark's father called 911. Harris was taken by ambulance to Mt. Sinai Hospital. He had been shot in the bicep and was hospitalized for two weeks. As a result of the gunshot wound, he suffered nerve damage in his arm and has a limited range of use.

¶ 8        Clark, who was 37 years old at the time of trial and the father of six children, testified that he had two prior convictions for possession of a controlled substance and one conviction for

delivery of a controlled substance. He testified that shortly before midnight on February 2, 2017, he went to the liquor store on 63rd Street near his home on Rockwell Street. When he left the store, he encountered Johnson, his ex-girlfriend. Clark testified that Johnson wanted to go to his house, but he did not want her to because his current girlfriend was at his house. He and Johnson argued about this while she followed him home.

¶ 9 Clark went inside his house, but Johnson started ringing the doorbell. Clark went outside to the front porch, and he and Johnson continued arguing. Clark testified that as they were arguing, he looked up and saw three men walking down the sidewalk on Rockwell Street and one of the men "walked past, looked dead in my face, you know. *** I saw him. He looked in my face." He recognized the individual who looked him in the face as defendant and identified him at trial. Clark indicated that he was on the porch and defendant was on the sidewalk, approximately two feet away, and he was able to see defendant's face, although part of it was covered by defendant's hoodie. Clark testified that he was familiar with defendant because he purchased a bag of cannabis from him approximately a year before and he also heard defendant's name around the neighborhood and saw him "every blue moon." Clark testified that the other two men with defendant were taller and had dreadlocks. Clark testified that one of the men was wearing a black hoodie and the other wore a hoodie with a dark blue coat.

¶ 10 Clark explained that "I don't mess with no young guys, period. And that's why *** I thought he respect me, saw my face, like." Clark testified that defendant

"looked at my face. I thought he was, like, no, that's the wrong man. He ain't no shorty. *** The next thing you know, he started shooting. He walked past us. He looked on my porch, had his hand in his pocket. He was on this side. The

other two guys was [*sic*] on the side—on the street side. They was [*sic*] on the sidewalk with him. And when he looked at my face, he hesitated."

¶ 11    Clark testified that he was on the porch arguing with Johnson, and he opened the front door to go inside. As he did this, Harris was trying to come out. Clark testified that he and Johnson stopped arguing when Clark saw defendant and the two other men walk by. He testified that, "When I saw them, I got shocked, like, oh, s\*\*\*. \*\*\* When I saw their face and he looked dead in my face." Clark testified that defendant walked past and then turned around and started shooting. He believed there were eight or nine gunshots. After the shooting stopped, he looked out and saw the men running towards 64th Street.

¶ 12    After the shooting, Clark realized that Harris had been shot in the arm. He also found Johnson lying on the front porch. Clark saw that Johnson had been shot in the back of the head, the bullet had come out of her right eye, and she also had been shot in the back. Johnson was lying on her stomach and breathing hard. Clark testified that he did not see Johnson get shot, but he did see who shot the gun. The police, fire department, and ambulance came. Clark spoke with police and identified defendant. He then went to visit Harris and Johnson.

¶ 13    Clark testified that he spoke with police at the station at 4 a.m. on February 3, 2017. He was shown a photographic lineup and identified defendant as the shooter. Clark testified that he went to the police station twice. The first time was on February 3, when he viewed the first photographic lineup. The second time was on February 17, when he spoke with an assistant state's attorney (ASA) and his interview was videotaped. He was again shown a photographic array in which he identified defendant. After he was shown the photographic lineup, the police showed him video footage from surveillance cameras that were located in the area of the shooting, and he was able to identify defendant in the videos because he could see his face and also identified

defendant because he had a limp when he walked. Defendant had a limp when he saw him the previous summer. Clark explained that the videos showed that there was a fourth man behind defendant and the two other men, but Clark did not realize there was a fourth individual until viewing the videos. Viewing various clips of surveillance video footage at trial, Clark identified defendant in each one. He also identified defendant in the video, which showed defendant turn back toward him and begin shooting.

¶ 14    Detective Rivera testified that he received an assignment at 12:35 a.m. on February 3, 2017, regarding people who had been shot on Rockwell Street. At Clark's house, he observed a pool of blood on the front porch and damage to the doorframe and window from "apparent projectiles." He also observed a backpack, cell phone, and some clothing on the porch. He found four 9-millimeter shell casings and two .380-caliber shell casings on the parkway in front of the house next door to Clark's house. Rivera identified the photographs that were taken at the scene showing this evidence. Rivera also obtained video recordings from surveillance cameras on nearby buildings and homes on Rockwell Street which showed the shooting.

¶ 15    Detective Rivera testified that he met with Clark at the police station at 2 a.m. on February 3, 2017. Clark told Rivera what he had observed earlier that night around midnight and identified defendant by name as the shooter. Clark said that defendant was "male black, five foot to five foot four, skinny, 130 to 150 pounds" and walked with a limp. Clark described the two other individuals with defendant as black males, "five-ten to six foot with dreadlocks."

¶ 16    Rivera testified that defendant was arrested on February 17, 2017. Rivera again met with Clark at the police station on February 17. After Clark was interviewed by an ASA, Rivera showed him the surveillance video footage, and Clark identified defendant in the videos.[1]

¶ 17    Detective Jonathan Washkevich testified that he served as an independent administrator of the photographic array to Clark at approximately 4 a.m. on February 3, 2017. He did not assemble the photographs, he did not know who was in the photographs, and he did not know anything about the investigation. He reviewed with Clark the photo lineup advisory form, which advised Clark that the perpetrator may or may not be in the lineup and he was under no obligation to identify anyone. After signing the form, Clark identified defendant immediately and stated, "That's Diamond right there. He is from the neighborhood. He shot my ex-girlfriend. He looked me dead in the face."

¶ 18    Detective Jorge Lopez testified that he and ASA Steve Scott met with Clark on February 17, 2017, at approximately 3 p.m. Lopez testified that during the interview, Clark identified defendant as the shooter. Clark agreed to record his statement, and he again identified defendant in a photographic array while being recorded.

¶ 19    In the defense case in chief, defendant presented the testimony of Taeyonna Brown, who was 20 years old at the time of trial and has two children. She testified that defendant was her "best friend," they had been friends for five or six years, and they do not have a romantic relationship. Brown testified that, on February 2, 2017, she and defendant were together all day. Brown testified that she, defendant, and six or seven others attended a party together at 10 p.m. near 61st Street and Union Avenue. The party was for a family member of one of their friends, and there were 30

---

[1]The parties entered stipulations regarding retrieval and inventory of the video recordings, stipulating that the recording systems were properly operational and the videos were recorded in the ordinary course of business.

to 40 people in attendance. She testified that she was with defendant on the couch in the dining room during the party for the entire time they were there. They left the party around midnight or 1 a.m. Defendant exited the bus before her, approximately 20 to 30 minutes after they left the party. She did not see him again until later that afternoon on February 3.

¶ 20     On cross-examination, Brown testified that she knew defendant had been shot in his right leg approximately one year before the February 2, 2017, shooting incident. She testified that he used to walk with a limp, but he does not have a limp anymore. She testified that she has visited him once or twice in jail and he called her multiple times from jail. Brown testified that she has not talked to defendant "in detail" about the case, but "he wanted me to tell people to come to court." She testified that defendant called her "Strawberry" or "Berry" for short.

¶ 21     She testified that everyone, including defendant, spent the night of February 1, 2017, at her house because it was the birthday of their friend, Dwayne, or "Wydo." She testified that on the night of February 2, 2017, they took the bus to the other birthday party. Brown went with defendant, her brother, "our friend KK, John, Wydo, his girlfriend, Sierra, our friend, nickname[d] Five," and Jermaine Watson, who was the father of her child. They caught the bus near 63rd Street and Western Avenue and rode for 15 to 20 minutes. She testified that the house where the party occurred was a two-flat with a wooden porch, but it was dark, and she did not remember what color it was. She testified that she smoked cannabis at the party, and defendant smoked cannabis and drank. She testified that she never went to the police and told them that she was with defendant because the police never asked and she "didn't think it worked like that." She testified that an investigator from the prosecutor's office came to her house on January 25, 2018, and asked to speak with her. She testified that she told him she would be willing to speak to him in his car, but

not inside her house. She testified that he asked if she wanted to speak to an attorney first, and she told him that she wanted to speak with defendant's attorney first.

¶ 22 On redirect, Brown testified that defendant never asked her to lie for him. He told her that he needed witnesses and "he wanted people to come to court and people to come visit him."

¶ 23 Defendant testified in his case in chief that, at the time of the shooting, he was employed by a temp service and living with his girlfriend. Defendant was shot in the back of his knee eight months before the incident at issue. He testified that the night before the shooting, he spent the night at Brown's house and she was his best friend. He testified that on February 2, 2017, he went with Brown at 9:30 p.m. to a birthday party for her cousin near 61st or 62nd Street and Union Avenue. He was also with "Jermaine, KK, Dewayne, and Tank." He testified that he was with Brown the entire time at the party, sitting on a couch smoking and drinking. Defendant testified that at approximately 12:40 p.m. or 1 a.m., he left the party with Brown and three of their friends. He was the first to get off the bus 10 to 15 minutes later. He was later arrested on February 17, 2017, at his mother's house.

¶ 24 On cross-examination, defendant testified that he had been to the same house for parties on four or five previous occasions and the party was for "our cousin relative, Arcola." Defendant testified that the house was a two-flat with a wooden porch. He denied that he later told detectives that he was at that house a lot for parties or that he told them that he spent the entire weekend there. He did not recall telling investigators that it was a party for Arcola's grandma. He testified that detectives showed him pictures of houses and a map but he was not able to identify the exact house. He testified that he was at a party at that house on both Thursday (February 2) and Friday (February 3) nights.

¶ 25    In the State's rebuttal case, it called Kimberly Hofsteadter, an investigator with the Cook County Department of Corrections. She testified that her role is to fulfill requests from the Cook County State's Attorney's Office for phone calls from the jail. She is familiar with how jail phone records are maintained and testified that Securus is the outside vendor that provides jail phone record services to the Cook County Department of Corrections. She testified that Securus allows inmates to make phone calls through its system and explained how the system is maintained. Hofsteadter testified that when an inmate is first booked, he is taken to a specific phone by the booking officer, where he must state his name three times and enter a unique PIN into a specific phone. The PIN is unique and specific to each individual inmate. Securus maintains the records of the calls and also records the calls. She testified that inmates are informed that the calls are being recorded. Hofsteadter testified that she is trained on how to retrieve calls from the Securus system and to make sure there are no errors in the system. She explained that the phones are located on the wall in every living unit in the jail. Hofsteadter testified that when a call is made, a record is generated that records the date, time, living unit, division, telephone number, duration of the call, and how the call ended.

¶ 26    In response to a subpoena, Hofsteadter personally generated a call detail report for the calls made by defendant between February 19 and April 2, 2017. She testified that the call detail report was kept in the ordinary course of business. She generated the report by entering defendant's unique PIN number into the Securus system. She testified that she checks for errors in a call detail report by making sure an inmate is allowed to make calls that day and checking for any discrepancies or disruptions by Securus. She did not find any errors in defendant's report. She testified that every time an inmate makes a telephone call, he must first enter his PIN number and then speak his name into the phone.

¶ 27        Hofsteadter identified at trial three CDs that contained the audio recordings of defendant's jail telephone calls that corresponded to the calls listed on the call detail report; there were over 400 calls. Hofsteadter identified another CD that contained two of the calls that were from the original CDs. The State played the CD containing the two phone calls. Hofsteadter testified that at the beginning of each of the two calls, she heard the individual making the call state, "Diamond Little," into the phone. She affirmed that the caller would have to state this "live" on the phone before a call will go through, in addition to entering his PIN. The call detail report indicates the calls were both made on February 25, 2017. In the calls, defendant discussed upcoming court dates and needing witnesses for court, "the party," whether they had gone to see if there were any cameras in the area, and an individual referred to as "Berry."

¶ 28        On cross-examination, Hofsteadter testified that she did not know who the individuals were on the other end of the line. Hofsteadter testified on redirect that a phone call could only be made after entering defendant's unique PIN and stating his name in comportment with what he said in the booking process.

¶ 29        In closing arguments, the State asserted that Clark unequivocally identified defendant numerous times and gave consistent accounts of what occurred. The defense argued that identification was made by only one witness, Clark, who is also a drug dealer, and highlighted inconsistencies in his account. Defense counsel asserted that Clark gave police defendant's name because he did not want to give the name of the real shooter, for whatever reason, so he "just gave the name out of a hat that he knew from the neighborhood." Defense counsel further argued that defendant had presented a credible alibi defense in the testimony of Brown and defendant. Regarding the phone calls, counsel argued that they "don't mean anything" because it was unknown who the calls were from or to and whether they were potential witnesses.

¶ 30    The trial court took the matter under advisement and rendered its ruling from the bench shortly thereafter. The trial court reviewed the evidence on the record and found that Clark's identification of defendant as the shooter was credible because he knew defendant from the neighborhood and from buying drugs from him, he was in close proximity, defendant turned and looked at Clark in the face, and Clark identified defendant immediately and with certainty. The trial court further found that his identification was supported by the other evidence, as the video showed defendant had a slight limp and was shorter than the other men, the video showed the shortest of the men turning and firing, defendant admitted he had previously been shot in the knee, and bullet casings were found at the scene. The court observed that 9-millimeter and .380-millimeter bullets could be fired from the same gun, although there was no testimony to that effect. The court noted that it could infer that there was more than one gun and another individual with defendant also fired when Clark's back was turned, but the court found that it was defendant who turned and fired the gun in the video. Even if there was a second weapon or shooter, defendant would still be accountable for injury caused. The court thus found defendant guilty of attempted first degree murder of Johnson. In an "act of judicial leniency," to avoid triggering consecutive sentences, the court entered a finding of not guilty as to all remaining counts.

¶ 31                                              B. Posttrial

¶ 32    Defense counsel filed a motion for a new trial, which the trial court denied following argument by the parties. The court then proceeded to sentencing. However, defendant informed the court that he wished to proceed *pro se* and file his own motion, which the trial court allowed.

¶ 33    Defendant then presented his handwritten *pro se* motion for ineffective assistance of counsel, alleging that (1) trial counsel failed to file pretrial motions and investigate the case, (2) counsel failed to provide defendant with charging instruments and verified complaints by the

victims, (3) counsel failed to file a motion to suppress identification, (4) counsel failed to have the shell casings tested, (5) counsel failed to challenge his arrest based on an investigative alert, (6) counsel failed to inform defendant that the charges were upgraded to two counts of attempt murder and one count of aggravated discharge of a firearm, (7) defendant "was not advised that he was arrested on signed complaints/information, converted into an indictment by grand jurors," and (8) "there were no sworn statements, presented to the grand jury by several witnesses, implicating the defendant in any criminal offenses."

¶ 34    The trial court allowed defense counsel to withdraw for purposes of the *Krankel* inquiry. The trial court first addressed defendant's contention that trial counsel failed to investigate the case, including investigating and presenting alibi witnesses. Counsel explained that he had investigators seek out and interview witnesses, but some could not be found or were not cooperative, and he presented the alibi defense at trial with the witness that was available. Defendant indicated that he agreed to go to trial without other witnesses.

¶ 35    The trial court next addressed defendant's complaint that trial counsel failed to give him copies of the charging instruments and other documents. Defendant stated that he was not provided with anything by counsel but had to obtain these documents himself. He stated, "[f]rom what I was reading in the incident report, the witness said that he was in the house when it happened. He said he didn't see nothing. And then he changed his story and said he was on the porch. It's in the incident report, my police report." The trial court questioned counsel about these allegations. Trial counsel responded that it was his normal procedure to provide such documents and that he met with defendant in jail on numerous occasions to go over every document in the case extensively with defendant, including the charging documents. Counsel explained that it was the public defender's policy that certain documents were not public record and must stay in the attorney's

possession. Counsel told the trial court "unequivocally" that he "went over every single charge with Mr. Little, explained that charge to him, had the documents right there. He was able to review them. So he had a chance to review them with me." He reviewed them more than once.

¶ 36     The trial court asked defendant whether counsel visited him in jail on more than one occasion, and defendant responded that counsel had and had gone over "some" of the documents. Defendant stated that he was not aware he had been charged with attempted murder, he only knew he was charged with aggravated battery. Trial counsel responded that he never told defendant he was charged only with aggravated battery, and the clerk's system also showed that defendant was charged with attempted murder. Trial counsel explained that perhaps defendant was confused because when he was initially arrested, there was a reference to aggravated battery. But counsel had explained to defendant how the grand jury was presented with the charges and indicted him on attempted murder. He explained from the time he was appointed that defendant was charged with attempted first degree murder and numerous other counts, and that there were three victims.

¶ 37     The trial court then questioned trial counsel about filing a motion to suppress the identification evidence. Trial counsel explained that he considered filing this motion, but decided as a matter of trial strategy that it was not necessary because

> "our theory of the case was not that Quenten Clark didn't know him somehow from the neighborhood or whatever but that he was pointing him out for various other reasons, not really the identification necessarily. It wasn't that he was making an incorrect identification that it wasn't Diamond Little, it was somebody else, that he was using him as the fall guy."

¶ 38     The trial court next questioned trial counsel regarding his failure to file a pretrial motion to quash arrest and suppress evidence. Counsel explained that there was an appellate court case in

which a dissenting opinion found arrests based on investigative alerts unconstitutional, and "defendants in jail clung to that minority dissenting opinion *** and I explained to him *** that is not the law. *** So there was certainly not any motion to be filed on that." Counsel additionally noted that he had the arrest information and defendant made no statements when he was arrested and no physical evidence was obtained based on the arrest. As there was no evidence gained from the arrest to suppress, counsel decided it would be a frivolous motion.

¶ 39    The trial court asked defendant if there were any other issues he wanted to discuss. Defendant brought up the two different shell casings that were recovered. The trial court stated that "even if there were two shooters *** you would be guilty by a theory of accountability."

¶ 40    The trial court then held that although defendant complained about counsel's failure to investigate, defendant admitted that he agreed with the strategy pursued at trial to proceed without one witness. Further, defendant also agreed that counsel visited him and discussed the case numerous times, and the court believed that counsel reviewed the charges and other documents with him, but the law required lawyers to keep documents in their possession. The court found that Clark identified defendant by name and in a photographic array, so there was probable cause to arrest defendant, and, even if there were any irregularities in his arrest, it did not prejudice defendant. There also was no evidence gained from the arrest to suppress. The court thus denied defendant's *pro se* motion for ineffective assistance of counsel. Defendant then indicated that he wished to continue to be represented by his counsel during the sentencing.

¶ 41    Following presentation of evidence in aggravation and evidence in mitigation by the parties, the trial court sentenced defendant to 15 years' imprisonment for the attempted first degree murder conviction, with a 15-year firearm enhancement, for a total of 30 years' imprisonment. The

trial court subsequently denied defendant's motion to reconsider sentence. Defendant filed a timely notice of appeal.

¶ 42                                    II. ANALYSIS

¶ 43                                  A. *Krankel* Claims

¶ 44        On appeal, defendant argues that the trial court erred in denying three of the claims he raised in his *pro se* motion claiming ineffective assistance of trial counsel following its preliminary *Krankel* inquiry. The three claims that defendant asserts showed a colorable claim of ineffective assistance are (1) failing to use an allegedly inconsistent prior statement to impeach Clark, (2) not filing a motion to suppress Clark's identifications of defendant in the photographic arrays, and (3) failing to challenge defendant's warrantless arrest, which was based on an investigative alert. Defendant asserts that the trial court should have appointed new counsel to represent defendant in pursuing these claims in a full evidentiary hearing.

¶ 45        A defendant has a constitutional right to the effective assistance of counsel. *People v. Gayden*, 2020 IL 123505, ¶ 27; U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. "It is well settled that a claim of ineffective assistance of counsel is evaluated under the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984)." *Gayden*, 2020 IL 123505, ¶ 27. "Under the *Strickland* test, a defendant must establish both that counsel's performance fell below an objective standard of reasonableness and that a reasonable probability exists that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* A defendant must establish both prongs of the test in order to prevail on a claim of ineffective assistance of counsel. *Id.*

¶ 46        The common law *Krankel* procedure is employed by the trial court when a defendant raises a *pro se* claim of ineffective assistance of trial counsel; it "encourages the trial court to fully

address these claims and thereby narrow the issues to be addressed on appeal." *People v. Roddis*, 2020 IL 124352, ¶ 34. This preliminary inquiry also creates "the necessary record for any claims raised on appeal." (Internal quotation marks omitted) *People v. Ayres*, 2017 IL 120071, ¶ 13. During the preliminary *Krankel* inquiry, a trial court may reach not only the factual basis of a defendant's *pro se* claims of ineffective assistance, but also the legal merits of such claims, in determining whether a claim lacks merit or requires appointing new counsel. *Roddis*, 2020 IL 124352, ¶¶ 61, 64. As our supreme court recently explained in *Roddis*:

> "New counsel is not automatically appointed in every case when a defendant presents a *pro se* posttrial motion alleging ineffective assistance of counsel. *People v. Moore*, 207 Ill. 2d 68, 77 (2003). Rather, when a defendant makes such a claim, the court should first examine the factual basis of the defendant's claim. *Id.* at 77-78. If the court determines that the claim lacks merit or pertains only to matters of trial strategy, then the court need not appoint new counsel and may deny the *pro se* motion. *Id.* at 78. However, if the allegations show possible neglect of the case, new counsel should be appointed. *Id.*" *Roddis*, 2020 IL 124352, ¶ 35.

See *Moore*, 207 Ill. 2d at 77-78 (collecting cases).

¶ 47 As part of the inquiry,

> "some interchange between the trial court and trial counsel regarding the facts and circumstances surrounding the allegedly ineffective representation is permissible and usually necessary in assessing what further action, if any, is warranted on a defendant's claim. Trial counsel may simply answer questions and explain the facts and circumstances surrounding the defendant's allegations." *Moore*, 207 Ill. 2d at 78.

Additionally, the trial court may also "base its evaluation of the defendant's *pro se* allegations of ineffective assistance on its knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations on their face." *Id.* at 79.

¶ 48    On appeal, "[t]he operative concern for the reviewing court is whether the trial court conducted an adequate inquiry into the defendant's *pro se* allegations of ineffective assistance of counsel." *Moore*, 207 Ill. 2d at 78. "The issue of whether the trial court properly conducted a preliminary *Krankel* inquiry presents a legal question that we review *de novo*." *Roddis*, 2020 IL 124352, ¶ 33. "If a trial court should have appointed new counsel and failed to do so" following the preliminary inquiry, this court "will reverse the trial court's *Krankel* ruling unless the error was harmless beyond a reasonable doubt." *People v. Robinson*, 2017 IL App (1st) 161595, ¶¶ 88-89. Where the trial court conducted a proper *Krankel* inquiry and reached a determination on the merits, "we will reverse only if the trial court's action was manifestly erroneous." *Id.* ¶ 90. "Manifest error" arises where the error is " 'clearly plain, evident, and undisputable.' " *Id.* (quoting *People v. Tolefree*, 2011 IL App (1st) 100689, ¶ 25). As our supreme court stated in *Roddis*, 2020 IL 124352, ¶ 56, "[t]he trial court, most familiar with the proceedings at issue, remains best situated to serve the interests of judicial economy by extinguishing conclusory claims."

¶ 49    We first examine defendant's contention that trial counsel was ineffective for failing to use an allegedly inconsistent prior statement that he attributes to Clark to impeach Clark, and the trial court should have appointed new counsel and granted a full evidentiary hearing on this issue. However, a close review of the lower court record reveals that defendant did not raise this specific claim in his *pro se* motion or argument to the trial court. As previously stated, when the trial court questioned defendant about his allegation in his motion that trial counsel failed to give him copies of charging instruments and other documents, defendant responded that he had to obtain the

documents himself and stated, "[f]rom what I was reading in the incident report, the witness said that he was in the house when it happened. He said he didn't see nothing. And then he changed his story and said he was on the porch. It's in the incident report, my police report." We note that the identity of "the witness" is unknown from defendant's remark. However, on appeal, defendant contends that it is Clark. Even assuming this is so, defendant's response to the trial court was not setting forth an additional separate allegation of failure to impeach. Rather, defendant made this comment in the context of his examples of how counsel failed to provide him with documents related to his case and inform him about all of the charges and victims and how defendant was forced to obtain the documents himself. That defendant was not raising a separate claim of failure to impeach is also borne out by defendant's written motion, where he again did not present such a claim. He instead asserted that counsel failed to provide him with the charging instruments and verified complaints by the victims.

¶ 50        After defendant explained his allegations to the trial court, the court questioned defense counsel, who explained that he visited defendant in jail on multiple occasions and he reviewed all documents in the case and the charges with defendant numerous times, but as a matter of office policy, he was not allowed to leave such documents with defendant. Defendant then reiterated that he was not aware he had been charged with attempted murder. Trial counsel explained that, in defendant's arrest report, there was a reference to aggravated battery, but counsel had explained to defendant from the outset of the case that the grand jury had indicted him on attempted murder. Defendant did not again refer to any issue with the police report or any statements made therein, despite being given the opportunity to add anything to his claim of ineffective assistance by the trial court. The trial court found that defendant agreed that counsel visited him and discussed the

case numerous times and that counsel reviewed the charges and other documents with him, but counsel was required to maintain possession of them.

¶ 51    Based on the record before us, we find that the trial court conducted an adequate *Krankel* inquiry into the basis for defendant's claim. "A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information." (Internal quotation marks omitted.) *People v. Smith*, 268 Ill. App. 3d 574, 579 (1994) (citing *United States ex rel. Partee v. Lane*, 926 F.2d 694, 701 (7th Cir. 1991)). Here, the trial court questioned defendant and his trial counsel about the points defendant actually raised in his motion and orally. The trial court gave defendant several opportunities to explain his claims to the court. Although defendant contends on appeal that the trial court failed to conduct an adequate inquiry into his allegation that trial counsel was ineffective for failing to impeach Clark with statements he allegedly made in a police report, this was not the claim that defendant raised or pursued in the trial court. "In order to trigger the trial court's duty to conduct a *Krankel* inquiry, it is the duty of the defendant to bring the *pro se* posttrial claim of ineffective assistance of counsel to the attention of the trial court." *People v. Zirko*, 2012 IL App (1st) 092158, ¶ 70 (citing *People v. Patrick*, 2011 IL 111666, ¶ 29). " '[A] defendant who fails to bring such a claim to the trial court's attention forfeits [the claim] notwithstanding having presented it in a letter to the court.' " (Emphasis omitted.) *Id.* (quoting *People v. Allen*, 409 Ill. App. 3d 1058, 1076-77 (2011)).

¶ 52    The trial court questioned defendant and counsel extensively about defendant's allegation that trial counsel failed to inform him about the charges and other aspects of the case or provide him with documents. Defendant had the opportunity to elaborate upon his reference to statements he read in the police report, but he made no specific contention that counsel failed to impeach any witnesses with such statements. Moreover, the trial court's inquiry showed that counsel reviewed

with defendant the charges and all associated documents involved in the case and did not conceal or improperly keep any information or documents from him. The trial court was also familiar with trial counsel's performance at trial and his cross-examination of the witnesses, including Clark. The record shows that trial counsel cross-examined Clark regarding where Clark was when the shooting started, his opportunity to view the shooter, his description of the shooting and the assailants, and Clark's statements to the police. Generally, counsel's choice as to which theory of defense to present and the manner in which to question witnesses constitute matters of trial strategy. *People v. Campbell*, 264 Ill. App. 3d 712, 732-33 (1992). The trial court's inquiry revealed no factual basis for his claim or possible neglect of the case. *Roddis*, 2020 IL 124352, ¶ 35. Accordingly, we find no error in the trial court's preliminary *Krankel* inquiry with respect to this claim. The court adequately examined the basis for defendant's claim and determined that it lacked merit or pertained to trial strategy. Therefore, new counsel did not need to be appointed. *Roddis*, 2020 IL 124352, ¶ 35.

¶ 53 We next turn to defendant's argument that the trial court erred in determining that it was not necessary to appoint counsel to further investigate and present defendant's claim that his trial counsel was ineffective for failing to file a motion to suppress Clark's identifications of defendant in the photographic arrays.

¶ 54 In order to show that counsel's failure to file a suppression motion constituted ineffective assistance, "the defendant must demonstrate both that the unargued suppression motion was meritorious and that a reasonable probability exists that the trial outcome would have been different had the evidence been suppressed." *Gayden*, 2020 IL 123505, ¶ 28. In a motion to suppress identification, the defendant bears the burden of establishing that, under the totality of the circumstances, the pretrial identification procedure was so unnecessarily suggestive that it gave

rise to a substantial likelihood of an unreliable identification. *People v. Jones*, 2012 IL App (1st) 100527, ¶ 24.

¶ 55    While a preliminary *Krankel* inquiry does not require a defendant to fully prove his claim of ineffectiveness, there must be some factual or legal basis for a trial court to determine that a defendant's allegation presents a colorable claim of possible neglect by his trial counsel. Here, however, defendant made no attempt in his written *pro se* motion or in his discussion with the judge to explain why he believes the photographic arrays or the procedure in showing Clark the arrays was unconstitutionally suggestive such that the identifications would be unreliable. On appeal, he asserts that the identification evidence corroborated crucial testimony and that trial counsel's choice not to file a motion to suppress the identifications was a poor strategic decision. However, as in the trial court, defendant fails on appeal to highlight any aspect of the identifications that he finds suggestive or faulty. Having failed to identify any grounds upon which a motion to suppress should have been granted, defendant has failed to show any possible neglect by his trial counsel in that regard.

¶ 56    We note that the photographic arrays were admitted into evidence at trial and Clark and various detectives testified about the procedures employed during the identification. These procedures included having another detective, who did not know which individual in the lineup was the suspect or know anything about the investigation, act as an independent administrator of the photographic lineup. This detective reviewed with Clark the advisory form, which stated that the perpetrator may or may not be in the lineup and Clark was under no obligation to identify anyone. The photographic arrays and this testimony were available to the trial court in considering defendant's ineffectiveness claim. We have also reviewed the photographic arrays and do not find them to be suggestive. The individuals in the lineup appear to be of similar age and have similar

builds and hair styles; there was no pronounced difference in the physical characteristics of the participants. The law does not require that all participants in the lineup be physically identical. *People v. Gabriel*, 398 Ill. App. 3d 332, 348 (2010); *People v. Allen*, 376 Ill. App. 3d 511, 520 (2007).

¶ 57     We also disagree with defendant's contention that his trial counsel's theory of defense "makes no sense" or lacked support. As previously set forth, when the trial court questioned defendant's trial counsel about this claim, counsel explained that he decided not to file a motion to suppress identification as a matter of trial strategy because it was not necessary based on his theory of the case, which was that Clark was using defendant as the "fall guy" for "various other reasons." The decision to file a motion to suppress identification is generally a matter of trial strategy entitled to great deference. *Gayden*, 2020 IL 123505, ¶ 28. As such, this court "will not indulge in hindsight analysis to determine whether counsel's decision was adequate under the circumstances." *People v. Rodriguez*, 312 Ill. App. 3d 920, 925 (2000). The fact that a different attorney may have pursued a different strategy with respect to the identification evidence or defense theory of the case is immaterial. *People v. Palmer*, 162 Ill. 2d 465, 476 (1994). Trial counsel here clearly made a strategic decision with respect to the identification evidence and the theory of defense to pursue, and "counsel's strategic choices are virtually unchallengeable." *Id.* Counsel's cross-examination and closing argument were consistent with his chosen strategy. Counsel highlighted discrepancies between Clark's testimony and the video evidence, such as what the suspects were wearing, whether there were three or four suspects, and whether the individual identified as defendant had a perceivable limp or was shorter than the other men. We note that Clark identified defendant by name to the police even before he was shown the photographic lineups. He also identified defendant by his limp. Clark's testimony revealed that he was familiar

with defendant based on previous drug transactions and being in the same neighborhood. Clark testified repeatedly, and told the investigating officers, that defendant "looked him dead in the face" before starting to shoot. Given this extremely strong identification evidence and the fact that defendant failed to identify anything suggestive about the photographic lineups, it was not unreasonable for trial counsel to make the strategic decision to avoid attacking the identification lineups directly. Accordingly, we find no error in the trial court's determination that counsel's decisions were matters of trial strategy, defendant failed to show any possible negligence by his trial counsel, and appointment of new counsel and an evidentiary hearing were not warranted. *Roddis*, 2020 IL 124352, ¶ 35.

¶ 58         Defendant next argues that the trial court should have appointed new counsel and granted an evidentiary hearing as to his claim that trial counsel failed to file a motion to quash his arrest and suppress evidence.

¶ 59         To show prejudice by trial counsel's failure to file a motion to quash arrest and suppress evidence, a defendant must demonstrate that the motion would be meritorious and that a reasonable probability exists that the outcome of the trial would have been different if the evidence had been suppressed. *People v. Henderson*, 2013 IL 114040, ¶ 15. Counsel cannot be deemed ineffective if the motion would have been futile. *People v. Givens*, 237 Ill. 2d 311, 331 (2010). Whether to file such a motion constitutes a matter of trial strategy; we therefore give counsel's decision great deference. *People v. Martinez*, 348 Ill. App. 3d 521, 537 (2004).

¶ 60         "Probable cause for an arrest exists 'when the totality of the facts and circumstances known to the officer is such that a reasonably prudent person would believe that the suspect is committing or has committed a crime.' " *People v. Braswell*, 2019 IL App (1st) 172810, ¶ 27, *leave to appeal denied*, No. 125707 (Ill. Mar. 25, 2020) (quoting *People v. Rodriguez-Chavez*, 405 Ill. App. 3d

872, 875 (2010)). A defendant bears the initial burden of proof in a motion to quash arrest and suppress evidence. *People v. Simmons*, 2020 IL App (1st) 170650, ¶ 49. Once he shows a *prima facie* case of an unconstitutional arrest, the burden shifts to the State to show his warrantless arrest was based on probable cause. *Id.* However, the ultimate burden of proof remains with the defendant. *Id.*

¶ 61    When questioned by the trial court about this claim, defendant's trial counsel justified his decision not to file such a motion on grounds that (1) it had no legal basis because defendant was relying on a minority opinion in an appellate court case (*People v. Hyland*, 2012 IL App (1st) 110966 (Salone, P.J., specially concurring)), which found that arrests based on investigative alerts were unconstitutional, and (2) no evidence was obtained from the arrest; therefore, there was no evidence to suppress. The trial court determined that Clark had identified defendant by name and in a photographic array, so there was probable cause to arrest defendant regardless of any irregularities in his arrest, and that defendant was not prejudiced because there was no evidence gained from the arrest that could be suppressed.

¶ 62    Defendant argues that trial counsel should have anticipated that the minority opinion in *Hyland*, 2012 IL App (1st) 110966, which opined that arrests made pursuant to investigative alerts are unconstitutional, would later be adopted two years after defendant's arrest in *People v. Bass*, 2019 IL App (1st) 160640, ¶ 43, *aff'd in part, vacated in part*, 2021 IL 125434. In *Bass*, a divided panel of the appellate court concluded that an arrest is unconstitutional under the Illinois Constitution when it is based on an investigative alert, even where the investigative alert is supported by probable cause. *Id.* ¶ 43. The majority concluded that the Illinois Constitution requires a warrant supported by probable cause for a valid arrest. *Id.* ¶ 62.

¶ 63    However, in *Braswell*, 2019 IL App (1st) 172810, ¶ 39, this court found *Bass* incorrectly decided and declined to follow it. The *Braswell* court observed that *Bass* "creates the somewhat paradoxical situation where police may arrest an individual without a warrant and without an investigative alert if they have probable cause to do so, but that same arrest becomes unconstitutional if police issue an investigative alert based on the same facts that gave rise to the probable cause." *Braswell*, 2019 IL App (1st) 172810, ¶ 39. This court thus adopted the reasoning outlined by Justice Mason in her partial dissent in *Bass*, where she observed that there was

> "no principled basis on which to hold that police may arrest an individual without a warrant and without an investigative alert as long as they have probable cause, but if they issue an investigative alert based on the same facts giving rise to probable cause, they have run afoul of the Illinois Constitution." *Bass*, 2019 IL App (1st) 160640, ¶ 120 (Mason, J., concurring in part and dissenting in part).

Other panels of this court have followed the reasoning of *Braswell* and Justice Mason's dissent in *Bass*. See *People v. Simmons*, 2020 IL App (1st) 170650, ¶¶ 62-64; *People v. Bahena*, 2020 IL App (1st) 180197, ¶¶ 59-64; *People v. Thornton*, 2020 IL App (1st) 170753, ¶¶ 45-50. We note that our supreme court recently handed down its decision in *People v. Bass*, 2021 IL 125434, ¶ 26, and agreed with the appellate court in finding that the traffic stop (which led to the discovery of the investigative alert issued for the defendant) was unreasonably extended and the motion to suppress should have been granted. The supreme court affirmed the appellate court's decision to reverse the defendant's conviction and remand for a new trial. *Id.* ¶ 27. However, having disposed of the case on those narrow grounds, it declined to "express any opinion on limited lockstep analysis, its application to warrants or investigatory alerts, or the constitutionality of investigative alerts. Those portions of the appellate opinion dealing with these issues are vacated." *Id.* ¶¶ 29-31.

¶ 64    Here, as the trial court observed, regardless of the constitutionality of an arrest based on an investigative alert, defendant's arrest here was supported by probable cause in that Clark had already identified him as the shooter by name and in a photographic array. Thus, defendant's arrest did not run afoul of the Illinois Constitution. Moreover, as trial counsel explained, the minority opinion in *Hyland* would not serve as a legal basis to prevail on a motion to quash. The trial court conducted a sufficient inquiry to reveal that counsel made a strategic decision not to file a motion to quash because the motion would have been futile, given the state of the law and the existence of probable cause supporting the arrest. *Henderson*, 2013 IL 114040, ¶ 15; *Givens*, 237 Ill. 2d at 331.

¶ 65    Defendant also contends that the trial court incorrectly found that he suffered no prejudice from his unlawful arrest because there was no evidence procured as a result. Defendant argues that the recorded phone calls that he made in jail and the State introduced in its rebuttal case were fruits of an unlawful arrest and would have been suppressed had counsel challenged the arrest. The State asserts that this evidence was too attenuated from his arrest.

¶ 66    "In criminal cases, courts suppress evidence obtained as a result of an unreasonable search or seizure, provided that the causal link between the evidence and the unreasonable search or seizure is not too attenuated." *People v. Wear*, 371 Ill. App. 3d 517, 527 (2007). "[A] court must consider 'whether the chain of causation proceeding from the unlawful conduct has become so attenuated or has been interrupted by some intervening circumstance so as to remove the "taint" imposed upon that evidence by the original illegality.' " *Henderson*, 2013 IL 114040, ¶ 33 (quoting *United States v. Crews*, 445 U.S. 463, 471 (1980)). "Factors relevant to an attenuation analysis include the temporal proximity of the illegal police conduct and the discovery of the

evidence; the presence of any intervening circumstances; and the purpose and flagrancy of the official misconduct." *Id.*

¶ 67    The record reflects that the recorded jail telephone calls that the State introduced at trial were made on February 25, 2017, several days after defendant's February 17, 2017, arrest. See *People v. Thornton*, 2020 IL App (1st) 170753, ¶ 54 (sufficient attenuation between arrest and initiation of collecting incriminating evidence when 14 hours passed between the defendant's arrest and when he first made incriminating statements and provided a buccal swab).

¶ 68    Further, the calls were not prompted by police misconduct, that is, they were not statements made to the police during his arrest, while being interrogated by the police following his arrest, or as part of any "fishing expedition" by the police. Rather, the calls were made at defendant's own volition to his friends while he was in jail.

¶ 69    Defendant was not prejudiced because, even assuming his arrest was unconstitutional, the calls were too attenuated from his arrest and no other evidence was gained from his arrest. Accordingly, the trial court did not manifestly err in finding that defendant's claim lacked merit, and there was no basis upon which to find possible neglect warranting appointment of new counsel. *Roddis*, 2020 IL 124352, ¶ 35.

¶ 70                B. Admission of Jail Telephone Calls

¶ 71    In his second issue on appeal, defendant argues that the trial court abused its discretion in admitting into evidence the recorded jail telephone calls in the State's rebuttal case.

¶ 72    While defense counsel raised a timely objection to this evidence at trial, it was not subsequently raised in a posttrial motion. "[T]he presence of both a trial objection and a written post-trial motion raising the issue are necessary to preserve an issue for review." *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Failure to properly preserve an issue results in forfeiture on appeal.

*Id.* at 186-87. Under the plain error doctrine, however, a reviewing court may consider an unpreserved claim of error

> "when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

Defendant bears the burden of persuasion. *People v. Herron*, 215 Ill. 2d 167, 187 (2005).

¶ 73 Defendant argues that the first prong of plain error is primarily applicable here because the State's case was weak and the admission of the telephone calls allowed the State to argue that defendant attempted to fabricate defense testimony.

¶ 74 "As with any evidence, the party seeking admission of an audiotape must establish an adequate foundation." *People v. Tetter*, 2019 IL App (3d) 150243-B, ¶ 30 (citing *People v. Williams*, 109 Ill. 2d 327, 338 (1985)). "The party establishes sufficient foundation when 'a witness to the conversation recorded on the tape *** testifies that the tape, as it exists in court, accurately portrays the conversation in question.' " *Id.* (quoting *Williams*, 109 Ill. 2d at 338).

¶ 75 Where no witness with personal knowledge is available to testify at trial, a party may authenticate a recording under the silent witness theory " 'if there is sufficient proof of the reliability of the process that produced the photograph or videotape.' " *Id.* ¶ 31 (quoting *People v. Vaden*, 336 Ill. App. 3d 893, 898 (2003)). "Generally, this is shown if the recording's proponent presents evidence as to (1) capability of the device for recording; (2) competency of the operator; (3) proper operation of the device; (4) preservation of the recording with no changes, additions, or

deletions; and (5) identification of the speakers." (Internal quotation marks omitted.) *People v. Viramontes*, 2017 IL App (1st) 142085, ¶ 69. Our supreme court has emphasized that

> "this list of factors is nonexclusive. Each case must be evaluated on its own and depending on the facts of the case, some of the factors may not be relevant or additional factors may need to be considered. The dispositive issue in every case is the accuracy and reliability of the process that produced the recording." *People v. Taylor*, 2011 IL 110067, ¶ 35.

¶ 76 We review the trial court's ruling on the admissibility of evidence for an abuse of discretion, which occurs when the court's ruling is arbitrary, fanciful, or unreasonable. *People v. Fredericks*, 2014 IL App (1st) 122122, ¶ 39.

¶ 77 Defendant argues that the State failed to lay an adequate foundation for admission of the jail telephone calls under the silent witness theory. Defendant asserts that there was no evidence regarding the capability of the device used to record the conversations, the competency of the individual operating the device, or whether the recording device was operating correctly at the time of the calls.

¶ 78 We find *People v. Sangster*, 2014 IL App (1st) 113457, to be instructive in applying the silent witness theory to the admission of the recordings that were generated from a telephone recording system incorporated into the jail. In *Sangster*, the defendant contended, as does defendant in this case, that the State failed to lay a proper foundation for the admission of a recorded jail telephone call made by the defendant to an unidentified woman while the defendant was in jail. *Id.* ¶¶ 46, 49. This court found that the trial court did not abuse its discretion in admitting the recording into evidence because the State laid a proper foundation through the testimony of a correctional officer who listened to and downloaded the recordings and testified

that the jail's telephone system required a PIN and voice recognition identification before a call could be initiated. *Id.* ¶¶ 50-52. As such, the ability of the defendant to make the call and the jail telephone system's recording of that call served as sufficient proof that the jail telephone system was working properly. *Id.* ¶ 50. In addition, the court noted that the correctional officer testified to her competency in operating the phone system, in that she was trained by the supplier of the system, and that the fact a call was placed and recorded by the system showed that it was operating properly. *Id.*

¶ 79        As in *Sangster*, we find the trial court did not abuse its discretion in admitting the recorded jail telephone calls into evidence here. Hofsteadter testified that she is an investigator with the Cook County Department of Corrections and her job entails fulfilling requests for phone call records from the jail and she is familiar with how the records are maintained. Hofsteadter testified that the outside vendor that provides the jail telephone recording system, Securus, allows inmates to make calls, keeps a record of calls, and records the calls. Hofsteadter explained that when an inmate is first booked into the jail, he registers with the Securus system by speaking his name three times into a specific phone in the booking area and entering a unique PIN, which is specific to each individual inmate. Hofsteadter testified that she was trained on how to retrieve calls from the system and ensure there are no errors in the system. Hofsteadter testified that the system also records the date, time, living unit, division, telephone number, duration of the call, and how the call ended. She testified that an inmate can make a call only after speaking his name into the phone in accordance with how he spoke his name during the booking process and entering his unique PIN.

¶ 80        Hofsteadter testified that she personally generated the call detail reports containing defendant's call information and the recordings of the calls. She indicated that call detail reports

are kept in the ordinary course of business. She generated the reports by entering defendant's unique PIN into the Securus system. She also checked for errors by ensuring that an inmate is allowed to make calls on a specific day and checking for any discrepancies or disruptions by Securus, and she did not find any errors in defendant's reports. When the recording of the two telephone calls was played at trial, Hofsteadter testified that, at the beginning of each call, she heard the individual making the call state, "Diamond Little," into the phone. She testified that the caller has to state this "live" on the phone and enter a PIN before a call will go through. The calls at issue were both made on February 25, 2017.

¶ 81    As in *Sangster*, we find that Hofsteadter's testimony, in addition to other parts of the record, provided sufficient proof of the reliability of the process that produced the recordings. *Tetter*, 2019 IL App (3d) 150243-B, ¶ 31; *Sangster*, 2014 IL App (1st) 113457, ¶ 50. Hofsteadter was trained on the Securus system to access and generate call detail reports and recordings of calls, and she was trained in how to detect errors in the system. Her testimony established that the Securus system was capable of recording inmate calls and logging the date and time of the call, the telephone number called, how the call terminated, and the inmate's PIN entered to make the call. As in *Sangster*, the fact that defendant was able to make the calls at all, and the fact that the calls were recorded, demonstrated that the system was working properly. *Sangster*, 2014 IL App (1st) 113457, ¶ 50; *Viramontes*, 2017 IL App (1st) 142085, ¶ 69. Her testimony was thus sufficient to establish the capability of the Securus system in recording the calls and the operating accuracy of the Securus system at the time of the calls.

¶ 82    Although defendant argues that there was no evidence regarding the competency of the individual operating the device, it is unclear that this factor applies under the circumstances, as it is unclear that the Securus system is operated by any individual when it records calls. Notably, the

*Sangster* court did not directly address this factor. *Sangster*, 2014 IL App (1st) 113457, ¶¶ 46-53. As our supreme court emphasized, the list of factors is nonexclusive, some factors may not be relevant in certain cases, and each case must be evaluated on its own facts to determine the reliability of the process that produced the recording. *Taylor*, 2011 IL 110067, ¶ 34. Here, Hofsteadter's testimony was sufficient to show the reliability of the process that produced the recordings.

¶ 83     Defendant also contends that *Sangster* differs from this case because the correctional officer in *Sangster* testified that the jail telephone system required a PIN and voice recognition identification before a call could be initiated. We find that, in similar fashion to *Sangster*, which also involved a call made by an inmate in the Cook County jail, Hofsteadter testified that in order to initiate a call, an inmate must enter his unique PIN and state his name into the phone in accordance with how he stated his name into the phone during the booking process.

¶ 84     Defendant further asserts that there was inadequate foundation to establish his identity as the caller, as no witness identified the voice as his. However, we find that there was sufficient evidence identifying defendant as the caller in both of the recorded calls published at trial. The State's evidence showed that the calls were made using defendant's unique PIN. Both calls began with the system advising that the person is receiving a prepaid collect call from an inmate and the caller then clearly stating his name, "Diamond Little." The voice of the caller sounded the same on the calls. The individual called referred to the caller as "Diamond" and the name of the individuals called were the same as defendant's ex-girlfriend and current girlfriend. The identity of the caller was further established by the content of the calls. During they calls, they referred to "Berry," who was defendant's best friend, Brown. They also discussed security cameras in the area, the party, trying to get witnesses to come to court, and upcoming court dates.

¶ 85        Although defendant argues that it is difficult to hear the individuals called say "Diamond," we observe that this goes to the weight of the evidence and not its admissibility. The caller can clearly be heard to state "Diamond Little" at the beginning of the calls. Defendant has not made "a colorable claim that the recording was other than authentic or accurate" either before the trial court or on appeal. *Sangster*, 2014 IL App (1st) 113457, ¶ 51. "Where a defendant does not present any actual evidence of tampering, substitution, or contamination, the State need only establish a probability that those things did not occur. [Citation.] Any deficiencies go to the weight, rather than the admissibility, of the evidence." *Id.*

¶ 86        We also find defendant's reliance on *People v. Smith*, 321 Ill. App. 3d 669, 675 (2001), inapposite because, in that case, there was absolutely no evidence admitted regarding authentication, *i.e.*, "no evidence as to the capability of the device for recording, the competency of the operator, the proper operation of the device, or the preservation of the recording with no changes, additions, or deletions."

¶ 87        Based on the evidence presented, the trial court's decision to admit the recorded telephone calls was not an abuse of discretion. Where "there was no error in the first instance, there can be no plain error." *People v. Lopez*, 2012 IL App (1st) 101395, ¶ 64 (citing *People v. Bannister*, 232 Ill. 2d 52, 79 (2008)). Accordingly, this issue is forfeited.

¶ 88        The State alternatively contends that the records were properly admissible as business records under section 115-5(a) of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-5(a) (West 2018)). Having found no error in the trial court's admission of the recordings pursuant to the silent witness theory, we decline to address this alternative argument.

¶ 89                                    III. CONCLUSION

¶ 90            For the reasons stated, we affirm the judgment of the circuit court of Cook County.

¶ 91            Affirmed.

---

## No. 1-18-1984

---

| | |
|---|---|
| **Cite as:** | *People v. Little*, 2021 IL App (1st) 181984 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 17-CR-3738; the Hon. Matthew E. Coghlan, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Maria A. Harrigan, of State Appellate Defender's Office, of Chicago (Joshua Sachs, of Law Office of Joshua Sachs & Associates, of Evanston, of counsel), for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Marci Jacobs, and Susan Wobbekind, Assistant State's Attorneys, of counsel), for the People. |

---