2019 IL App (3d) 180385

Opinion filed March 7, 2019

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2019

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois, |
| Plaintiff-Appellee, | ) ) | Appeal No. 3-18-0385 |
| v. | ) ) | Circuit No. 12-CF-767 |
| RICKY LEE LOBDELL, | ) ) ) | Honorable Katherine S. Gorman, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE O'BRIEN delivered the judgment of the court, with opinion.
Justices Carter and Wright concurred in the judgment and opinion.

**OPINION**

¶ 1        Defendant, Ricky Lee Lobdell, appeals from a preliminary *Krankel* inquiry, arguing that

the Peoria County circuit court erred in finding that he had not met the requirements of *Krankel*

and that counsel did not need to be appointed. We affirm.

¶ 2                                I. BACKGROUND

¶ 3        In 2014, defendant was convicted of criminal sexual assault (720 ILCS 5/11-1.20(a)(1)

(West 2012)) and sentenced to natural life imprisonment (*id.* § 11-1.20(b)(1)(B)). At the time the

crime was committed, defendant was on parole from a previous case and wore an ankle monitor.

A full recitation of the facts of the case can be found in *People v. Lobdell*, 2017 IL App (3d)

150074. We will briefly discuss the pertinent trial facts here. B.B. testified that on July 14, 2012, she walked from her apartment to the store and saw defendant in his vehicle. Defendant offered her a ride, which she refused. She then saw him parked in the parking lot at the store. Defendant offered B.B. money, which she also refused. The next day, defendant knocked on B.B.'s door. She lived approximately two blocks away from the store. She had not told defendant where she lived. B.B. opened the door and asked defendant if she could use his cell phone. Defendant allowed her to use his phone, and she then called her grandmother. After the call, she returned the phone to defendant, thanked him, closed the door, and went upstairs to care for her child. She did not lock the door. Defendant then entered B.B.'s apartment uninvited. He told her that he had just been released from jail for murder and grabbed her. B.B. saw that defendant had on an ankle monitor. Defendant pushed B.B. onto a mattress that was on the floor in the bedroom and pinned her down. Both B.B. and her child tried to get defendant off of her. Defendant held B.B.'s hands above her head, removed her pants, and penetrated her vagina with his penis. She told him to stop multiple times but eventually stopped struggling, as she feared that he would hurt her child. Defendant did not wear a condom, and B.B. believed that he had ejaculated inside her. Once defendant had left, B.B. called the police. She ultimately identified defendant in a photographic lineup on July 18, 2012. A sexual assault evidence collection kit was performed on B.B. at the hospital. There was some bruising on B.B.'s cervix. Swabs taken from B.B. matched defendant's DNA and did not match B.B.'s husband.

¶ 4    Detective Shawn Curry testified that he questioned defendant about his whereabouts later on July 18, 2012, after B.B. had identified him in the photographic lineup. Prior to the lineup, he had determined that defendant's phone number was the number with which B.B. had called her grandmother. Based on that, he brought B.B. in for the photographic lineup to verify that

2

defendant was the perpetrator. Before questioning defendant, Curry read defendant his *Miranda* rights (see *Miranda v. Arizona*, 384 U.S. 436 (1966)), and defendant waived his rights and agreed to speak to Curry. Curry was not one of the officers that "picked [defendant] up." Curry stated that, at that point, defendant was not under arrest for the alleged crime against B.B., but was instead cooperating with the investigation. Defendant's ankle monitor did not have global positioning system tracking but instead ran through the phone lines and only acknowledged whether he was home when he was required to be. Defendant repeatedly denied being anywhere near B.B. He later changed his story and said that B.B. flagged him down and asked for "sex from behind." Defendant did not want to do that so he laid her down on the mattress and had sexual intercourse with her. Defendant told Curry he had worn a condom, but when Curry pressed him on that point, defendant said the condom broke. Defendant then changed his story another time and told Curry he had not worn a condom. The State also entered into evidence that defendant had previously been convicted of rape to show propensity to commit the offense. The court found defendant guilty, explicitly finding that B.B. was a credible witness.

¶ 5        On appeal, this court upheld defendant's conviction, finding that evidence of defendant's prior rape conviction was admissible to show defendant's propensity to commit the offense and that the credible testimony of the victim, coupled with the testimony of the detective and defendant's prior rape conviction, was sufficient to support defendant's conviction, without considering defendant's prior convictions for home invasion and residential burglary. *Id.* ¶ 39. However, we noted that, before sentencing, defendant wrote a letter to the court, which stated in part:

> " '[U]pon the officers arresting me they were in violation of Amendment 4 and 5 of the United States Constitution; also the Illinois Constitution. The Arresting

officers did not have a warrant to step foot onto my father[']s property nor did they have consent, as well as no arrest warrant. My family and I were sitting in my father[']s fenced in back yard with a locked gate, when the officers came up to the gate they ask us our names and when I told them my name the officers reached over the gate unlocking it and step through onto my father[']s property and told me I was under arrest, I asked to see the warrants, they told me they had no warrant, and placed my hands behind my back and hand cuffs on my wrist, and took me to the Peoria county police depart., never reading me my rights. But instead told me it was over an ankle monitor violation, why [my attorney] never mentioned this during trial I do not know, that[']s why I am mentioning it now your honor.' " *Id.* ¶ 15.

We remanded for a preliminary inquiry pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984). *Lobdell*, 2017 IL App (3d) 150074, ¶ 39.

¶ 6        On remand the court conducted a preliminary *Krankel* inquiry. Defendant stated,

"Your Honor, I am writing this because I feel that my lawyer *** was ineffective as counsel and my constitutional rights were violated. The following reasons are why. [Counsel] did not file the motion to squash [*sic*] my arrest by suppressing the warrantless arrest from the very beginning that occurred at my father's home.

[Counsel] did not file a motion stating that my constitutional rights were violated when the Peoria Task Force and Officer Curry did not read me my *Miranda* rights, nor did [O]fficer Curry record or have me sign any documents stating that my rights was read to me.

4

Three, [counsel] did not file a motion to suppress my so-called statement, video, audio or phone records I have never seen, and this is my rights to see those records.

Four, [counsel] did not file a motion to bring the department of corrections or my parole agent or James or Anthony Lobdell, who would testify that I was not in violation of my terms of my mandatory supervised release when I was arrested. I was at home where I was supposed to be. The reason I was being arrested was because of an alert of my home monitoring device, which was the reason the Task Force was arresting me. By taking me out of my father's yard against my will, took me to the Peoria Police Department where Officer Curry was sitting in the waiting room in interrogation room 173 and cuffed me to a table.

Your Honor, I have given you four reasons to show that [my lawyer] was ineffective counsel and my constitutional rights was violated when the Peoria Task Force forced their way into my father's locked gate and arrested me without a warrant. Besides, I was in the Peoria County Jail 7/21/2012 when my parole agent violated me for catching a new case, catching a new case and it was not for my ankle bracelet.

Now, [counsel] was ineffective for not filing a subpoena to subpoena Officer Curry's work record to see if he ever did this to any other defendant. Never saying he read me my rights and never had me sign nothing, no video, none of that, and last, you got to remember, now we have to remember that Officer Curry is, who is the officer who was in charge of this investigation, keeps saying I was never under arrest.

5

So, your Honor, I am asking you to think this over and see that [counsel] was ineffective and that my constitutional rights were violated when I was removed illegally, arrested from my father's property."

Counsel responded,

"Your Honor, as the Court is aware, this was a bench trial that was heavily litigated. It's been a few years since it's occurred. Certain aspects of it stand out more in my mind than others, and if I recall from a strategy standpoint, when him and I worked together on this, which we met a number of times, it was—our emphasis focused on what we believed were prevarications from the witness or victim, alleged victim as we saw it and as it related to the physical evidence.

I can't remember the specifics of our conversations. I do know that we didn't bring up a whole lot as it relates to that interview that he had with the officers. I know that I crossed Detective Curry with regards to—I believe I crossed him. If I recall I crossed him in regards to, you know, not having put it on video or having him sign the *Miranda* waiver. That was all part of the evidence.

So that portion I did the best I could to bring out in the trial, but as to the other aspects of it, I will admit I think our focus on the strategy was, trial strategy was preparing as it related to that witness and what him and I believed were inaccuracies that were what we thoroughly presented at trial."

The court asked counsel if counsel had been "aware of all of the things that [defendant has] raised and made a decision to proceed as [counsel] did in the trial." Counsel stated, "I was aware of the facts. We also were aware that they were claiming there was a bracelet violation from the parole officer." Defendant then interrupted and said, "That was the wrist." Counsel continued,

6

"That we discussed previously as well. I'm familiar that there is case law that deals with the issue of whether or not *** an arrest without a warrant which obviously in that in a home is kind of per say unconstitutional although whether or not though that extends once they've been taken to the police station there's a whole body of law that goes beyond that if there's probable cause."

The court then asked counsel, "And with that knowledge, you made the decision to file the motions that you did or not file the motions that you did?" Counsel stated, "That's correct." The court then stated,

"Based upon what I have heard today, it would appear that the items that [defendant] raised were brought to [counsel's] attention and were considered in the trial of [defendant] and really amount more to a trial strategy as opposed to [counsel] didn't do the things necessary to effectively represent [defendant].

So the court finds that as a preliminary matter, [defendant] has not met the requirements of *Krankel* and so new counsel will not be appointed."

¶ 7                                    II. ANALYSIS

¶ 8        On appeal, defendant argues that his posttrial claims of ineffective assistance of counsel established possible neglect so as to warrant appointment of counsel and a full *Krankel* hearing. Specifically, defendant argues that he established possible neglect based on counsel's failure to move to suppress defendant's statement to the police, which was obtained after defendant's warrantless arrest.

¶ 9        Through *Krankel* and its progeny, our supreme court has provided a guide for considering posttrial *pro se* claims of ineffective assistance of counsel. *People v. Ayres*, 2017 IL 120071, ¶ 11. The circuit court need not automatically appoint new counsel whenever a defendant claims

ineffective assistance of counsel. *Id.* Instead, the court first conducts a preliminary inquiry to examine the factual basis of the defendant's claim. *Id.* To make such a determination, the court is permitted to (1) "inquire of trial counsel about the defendant's allegations," (2) "discuss the allegations with defendant," and (3) "make its determination based on its knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations." *Id.* ¶ 12. The court need not appoint new counsel and may deny the *pro se* motion if it determines that the claim lacks merit or pertains only to matters of trial strategy. *Id.* ¶ 11. A defendant's claim lacks merit if "his allegations are 'conclusory, misleading, or legally immaterial' or do 'not bring to the trial court's attention a colorable claim of ineffective assistance of counsel.'" *People v. Burks*, 343 Ill. App. 3d 765, 774 (2003) (quoting *People v. Johnson*, 159 Ill. 2d 97, 126 (1994)).

¶ 10        "We review *de novo* the procedure the trial court used to conduct the preliminary *Krankel* inquiry." *People v. Robinson*, 2017 IL App (1st) 161595, ¶ 88. "If we find that the trial court committed an error in procedure, we will reverse the outcome of the inquiry, unless the error was harmless beyond a reasonable doubt." *Id.* "However, if the trial court properly conducted the entire *Krankel* inquiry and reached a determination on the merits, we will reverse only if the trial court's action was manifestly erroneous." *Id.* ¶ 90. "The term 'manifest error' has been interpreted to mean error which is clearly evident, plain, and indisputable." *People v. Ruiz*, 177 Ill. 2d 368, 384-85 (1997). Defendant, here, has not raised an issue with the procedure the circuit court used to conduct the preliminary inquiry but instead solely claims that the court erred in its determination on the merits. Therefore, we review the circuit court's determination for manifest error.

¶ 11        To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) "counsel's performance was objectively unreasonable under prevailing professional norms"

8

and (2) "there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *People v. Cherry*, 2016 IL 118728, ¶ 24 (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)). Where an ineffectiveness claim is based on counsel's failure to file a motion to suppress, in order to establish the second prong, "the defendant must demonstrate that the unargued suppression motion is meritorious, and that a reasonable probability exists that the trial outcome would have been different had the evidence been suppressed." *People v. Henderson*, 2013 IL 114040, ¶ 15. "Because a defendant must satisfy both prongs of the *Strickland* test to prevail, the failure to establish either precludes a finding of ineffective assistance of counsel." *Cherry*, 2016 IL 118728, ¶ 24. "To prove counsel's representation was deficient, the defendant must overcome a 'strong presumption' that counsel's conduct was the result of sound trial strategy, not incompetence. [Citation.] Counsel's failure to file a motion to suppress does not demonstrate incompetent representation when it turns out the motion would have been futile." *People v. Valladares*, 2013 IL App (1st) 112010, ¶ 70 (quoting *People v. Pecoraro*, 175 Ill. 2d 294, 319-20 (1997)).

¶ 12        Here, defendant was arrested without a warrant in the fenced-in back yard of his home.

> "In order to effect a valid, warrantless arrest, a police officer must have probable cause to arrest. [Citation.] 'Probable cause exists when the totality of the facts and circumstances known to the officers is such that a reasonably prudent person would believe that the suspect is committing or has committed a crime.' [Citation.] *** Moreover, the determination as to whether there was probable cause to arrest is based on facts known to the police at the time the arrest was made." *People v. Garvin*, 219 Ill. 2d 104, 126 (2006) (McMorrow, J., concurring,

9

joined by Freeman, J.) (quoting *People v. Montgomery*, 112 Ill. 2d 517, 525 (1986)).

Defendant stated that he was told he was being arrested for an ankle monitor violation. Further, by the time he was arrested, defendant had been identified in the photographic lineup as the perpetrator, and his phone had been identified as that used to call B.B.'s grandmother. Either of these gave the officers probable cause to arrest defendant for violating his parole. See 730 ILCS 5/3-3-7 (West 2012). Since the officers had probable cause to arrest defendant, counsel was not ineffective for failing to file a motion to suppress, and the court did not err in denying defendant's claim.

¶ 13        In coming to this conclusion, we reject defendant's argument that, under the fourth amendment, the police could not conduct a warrantless arrest of him at his home. "[P]robationers and parolees enjoy a greatly diminished expectation of privacy due to their status as probationers and parolees, and the salient government interest in preventing recidivism and protecting society from future crimes." *People v. Wilson*, 228 Ill. 2d 35, 41 (2008). As a condition of parole, defendant was required to "consent to a search of his or her person, property, or residence under his or her control." 730 ILCS 5/3-3-7(a)(10) (West 2012). Defendant's "status as a parolee, coupled with the plain language of his search condition, reduced his expectation of privacy in his residence to a level that society would not recognize as legitimate. Accordingly, the special protection normally afforded to an individual's home does not apply to him." *Wilson*, 228 Ill. 2d at 52.

¶ 14        Moreover, even if we were to accept defendant's argument that his arrest was unlawful and his statements should have been suppressed, defendant cannot show that he was prejudiced

under the second prong of *Strickland* because the trial outcome would not have been different had the evidence been suppressed. See *Henderson*, 2013 IL 114040, ¶ 15.

> "B.B. testified that defendant knocked on her door, and she answered and asked to use his cell phone. After using his cell phone, she returned it, closed the door, and went upstairs into her apartment. She did not lock the door. She was tending to her crying child when defendant came into her apartment and grabbed her around the waist. B.B. said that defendant pushed her onto the mattress, pinned her down, held her arms above her head, and removed her pants. When B.B.'s child came in, defendant pushed the child away. He then had sexual intercourse with B.B. without her consent." *Lobdell*, 2017 IL App (3d) 150074, ¶ 30.

The circuit court found B.B. credible, and we defer to this credibility finding. See *id.* Moreover, Curry testified that B.B. identified defendant as the perpetrator in the photographic lineup, police had identified defendant's phone number as that which B.B. had used to call her grandmother, and defendant had a prior conviction for rape. See *id.* This evidence, without any of defendant's statements, was enough to convict defendant beyond a reasonable doubt of criminal sexual assault.

¶ 15                                        III. CONCLUSION

¶ 16            The judgment of the circuit court of Peoria County is affirmed.

¶ 17            Affirmed.