2025 IL App (1st) 231028-U

FIFTH DIVISION
January 24, 2025

No. 1-23-1028

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 13 CR 15179 |
| | ) | |
| DASHONTI WILEY, | ) | Honorable |
| | ) | Carl B. Boyd, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

PRESIDING JUSTICE MIKVA delivered the judgment of the court.
Justices Oden Johnson and Navarro concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court did not err in declining to appoint new counsel for further proceedings following a preliminary inquiry pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984), because defendant did not establish trial counsel's possible neglect of the case premised on counsel's failure to file a motion to suppress witness identifications.

¶ 2    Following a jury trial, defendant Dashonti Wiley was convicted of first degree murder and sentenced to 55 years in prison. On direct appeal, Mr. Wiley argued that his case should be remanded due to the trial court neglecting to hold a preliminary inquiry into his *pro se* claim of ineffective assistance pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984). That claim was based on trial counsel's failure to file a pretrial motion to suppress witness identifications. This court

agreed and remanded for such inquiry. *People v. Wiley*, 2020 IL App (1st) 172323-U. After a hearing, the trial court did not appoint new counsel.

¶ 3 In this appeal, Mr. Wiley argues that the trial court erred in not finding possible neglect by trial counsel for failing to move to suppress the witness identifications as suggestive. In the alternative, Mr. Wiley argues that the trial court erred in not *sua sponte* appointing counsel to develop the record regarding the offender's age provided to the police by the witnesses and how a particular witness described the offender to police. We affirm.

¶ 4                                          I. BACKGROUND

¶ 5 Mr. Wiley was charged in the shooting death of Keithen Rupert. The State proceeded on four counts of first degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2012)), alleging that Mr. Wiley personally discharged a firearm that proximately caused Mr. Rupert's death.

¶ 6 At trial, Deandre Boatman testified that on July 18, 2013, at approximately 1 p.m., he and Mr. Rupert were "standing outside *** selling weed." A woman, Tunisha, who sold marijuana from her home, approached Mr. Boatman and Mr. Rupert and was angry that they were selling marijuana "three houses down" from her. She began "poking" Mr. Rupert in his face. Mr. Rupert then engaged in a "fist fight" with Tunisha's younger son. A man, whom Mr. Boatman identified in court as Mr. Wiley, approached, and Mr. Boatman punched him in the face. Mr. Boatman had never seen Mr. Wiley before.

¶ 7 Mr. Boatman and Mr. Rupert eventually went to the home of brothers Deshawn Mayo (Deshawn) and Desmond Mayo (Desmond) and spoke with them about the altercation with Tunisha. As Mr. Boatman and Mr. Rupert left the Mayo home, Mr. Boatman noticed a white Astro van and heard "multiple" gunshots from an alley. When the shots stopped, Mr. Rupert lay on the ground and stated that he could not breathe. Mr. Rupert was eventually taken to the hospital where

he died.

¶ 8    Mr. Boatman spoke with officers at the police station and gave a statement to an assistant state's attorney. Prior to giving the statement, Mr. Boatman viewed a lineup and identified Mr. Wiley as the individual he had punched. The State showed Mr. Boatman a photograph of the lineup where he identified Mr. Wiley and asked him to circle the individual he identified. The photograph is included in the record on appeal. In the photograph, five black males are sitting on what appears to be a bench. The first and second individuals are medium-complected and the third, fourth, and fifth individuals are dark-complected. The third and fifth individuals are slightly shorter than the others, and the second and fourth individuals have a heavier build than the others. The fifth individual has longer hair, the first, third, and fourth individuals have shorter hair close to their scalp, and the second individual is shaven or bald. Mr. Boatman circled the second individual. On cross-examination, Mr. Boatman stated that he did not see who did the shooting.

¶ 9    Deshawn testified that on July 18, 2013, at approximately 3 p.m., he and Desmond were outside their home speaking with Mr. Boatman and Mr. Rupert about the previous altercation with Tunisha. Deshawn noticed a van driving down the alley and saw a man running in a "crouched" position from the van toward Deshawn's home. Deshawn eventually saw the man's face and identified him as Mr. Wiley in court. Deshawn had never seen Mr. Wiley before. Deshawn could see Mr. Wiley's face as he was shooting as nothing obstructed his view. Mr. Wiley held a "big" firearm in both hands and fired 7 to 10 shots before retreating to the van. Mr. Rupert was shot, fell to the ground, and could not move.

¶ 10    Deshawn described Mr. Wiley as "light" skinned with a "heavy" build and "close to" a bald head. Deshawn went to the police station and viewed a lineup. He was separated from Mr. Boatman and Desmond when he viewed the lineup. He identified Mr. Wiley in the lineup as the

shooter. The State showed Deshawn an unmarked copy of the same lineup photograph that had been shown to Mr. Boatman and asked him to circle the individual he identified. The photograph is included in the record on appeal. Deshawn circled the second individual.

¶ 11    On cross-examination, Deshawn clarified that he could not see the firearm in Mr. Wiley's hands as he crouched down, but Deshawn could tell from Mr. Wiley's hands when he was running that he had a firearm. Prior to going to the police station, Deshawn had been with Mr. Boatman and Desmond for about an hour. On redirect, Deshawn stated that no trees blocked his view of Mr. Wiley. As Mr. Wiley approached, Deshawn stared at Mr. Wiley's face and not the firearm.

¶ 12    Desmond testified that on July 18, 2013, in the "afternoon," he and Deshawn were walking to the corner store when he noticed a white van, driven by Mr. Wiley, exiting the alley. Desmond had never seen Mr. Wiley before. Desmond and Deshawn encountered Mr. Boatman and Mr. Rupert and discussed the previous altercation they had outside Desmond and Deshawn's home. Desmond saw the same white van drive into the alley and then saw Mr. Wiley running with a "big" firearm toward them from the direction of the van. Desmond could see Mr. Wiley's face. Mr. Wiley squatted down, began shooting, and Desmond ran. Once the shots stopped, Desmond saw Mr. Wiley run toward the van and "[take] off."

¶ 13    Desmond heard Mr. Rupert say, "I'm hit." Mr. Rupert was transported to the hospital and Desmond stayed behind to speak with officers who had arrived on the scene. He gave them a description of the vehicle and of Mr. Wiley. Desmond went to the police station to speak with police and an assistant state's attorney. There, he viewed a lineup alone and identified Mr. Wiley as the shooter. The State showed Desmond an unmarked copy of the same lineup photograph that had been shown to Mr. Boatman and Deshawn and asked him to circle the individual he identified. The photograph is included in the record on appeal. Desmond circled the second individual.

Desmond said his view of Mr. Wiley while Mr. Wiley was crouched down was not obstructed and that he would "never forget that face."

¶ 14    Harvey police officer Wallace testified that he responded to the scene on July 18, 2013, and spoke to witnesses who described the offender. The offender was described as a black male, five feet nine inches tall, and 225 pounds, who fled in a white minivan. Officer Wallace learned from Tunisha that her brother, Mr. Wiley, owned a white van. Officer Wallace and other officers searched the Secretary of State's records and discovered that Mr. Wiley owned a white Chevrolet minivan. Mr. Wiley was eventually arrested.

¶ 15    Officer Wallace requested that Mr. Boatman, Deshawn, and Desmond come to the police station to view an in-person lineup. Officer Wallace tried to fill the lineup with individuals who matched the description of the offender. The witnesses viewed the lineup one by one and were not allowed to speak to other witnesses afterwards. They were also informed that the offender may or may not be in the lineup and that they were not required to make an identification. Deshawn and Desmond identified Mr. Wiley as the shooter and Mr. Boatman identified Mr. Wiley as the individual he had punched.

¶ 16    On cross-examination, Officer Wallace testified that lineups can be compiled using individuals already at the police station or from individuals off the street. Mr. Wiley was born in 1974 and the other four lineup participants were born in 1985, 1993, 1995, and 1993.

¶ 17    In closing, trial counsel argued that Mr. Boatman, Deshawn, and Desmond had the opportunity to speak with one another prior to making their identifications. Counsel also argued that one lineup participant was over 20 years younger than Mr. Wiley and the closest person in age to Mr. Wiley was 11 years his junior. None of the other lineup participants had a "shaved *** bald head" like Mr. Wiley and, according to counsel, the lineup was set up to encourage the witnesses

to pick Mr. Wiley.

¶ 18    The jury found Mr. Wiley guilty of first degree murder.

¶ 19    Trial counsel filed a motion for a new trial, which the trial court denied. Mr. Wiley also wrote a handwritten letter to the court requesting that the court grant a new trial or overturn the jury verdict due to "several issues" not addressed at trial, including that he was "suggested" as being the perpetrator during the lineup.

¶ 20    At sentencing, Mr. Wiley requested to ask a question, which the judge refused. Mr. Wiley told the judge he had written letters to the court, but the judge stated that he did not read them. Mr. Wiley then read a letter in allocution where he stated that he should be granted a new trial, or the verdict should be overturned in part due to the suggestive identifications.

¶ 21    Mr. Wiley was subsequently sentenced to 55 years in prison for one count of first degree murder, which included a 25-year enhancement for the use of a firearm, with all other counts merging into that count. Mr. Wiley filed a motion to reconsider his sentence, which was denied.

¶ 22    On direct appeal, Mr. Wiley alleged that the trial court failed to conduct any inquiry into his *pro se* posttrial claims of ineffective assistance as required by *Krankel*. *Wiley*, 2020 IL App (1st) 172323-U, ¶¶ 2, 16. This court found that Mr. Wiley's letters required a preliminary *Krankel* inquiry and remanded for the trial court to determine whether Mr. Wiley's claims showed "possible neglect of the case warranting appointment of counsel." *Id*. ¶¶ 21, 28.

¶ 23    On February 24, 2023, the trial court held a preliminary *Krankel* inquiry into Mr. Wiley's *pro se* claims of ineffective assistance. At that hearing, Mr. Wiley asserted that trial counsel failed to file a pretrial motion to suppress the lineup as suggestive. Specifically, Mr. Wiley alleged he was placed in a lineup with "a group of younger guys nowhere near matching [his] description." The person closest to him in age in the lineup was 11 years his junior and no one else had a "shaved

\*\*\* bald head" like him.

¶ 24    Trial counsel responded that the issue was a "good trial issue," which he argued as such, but he did not believe the lineup was "unduly suggestive or unconstitutional" or else he would have filed a motion to suppress. Counsel stated he challenged the identifications in several ways including arguing that the witnesses had an opportunity to speak with each other prior to making their identifications.

¶ 25    The trial court ruled that counsel's decisions were objectively reasonable and his performance was not so deficient as to lead to a reasonable probability that the result of the proceeding would have been different had he filed a motion to suppress. The court then denied the *Krankel* claim and declined to appoint new counsel.

¶ 26                                    II. JURISDICTION

¶ 27    The trial court denied Mr. Wiley's *Krankel* claim on February 24, 2023, and Mr. Wiley timely filed his notice of appeal on March 8, 2023. We have jurisdiction over this appeal under article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rule 603 (eff. Feb. 6, 2013) and Rule 606 (eff. Mar. 12, 2021), governing appeals from final judgments in criminal cases.

¶ 28                                    III. ANALYSIS

¶ 29    On appeal, Mr. Wiley argues the trial court erred, on remand from this court, in not finding possible neglect by trial counsel for failing to move to suppress the pretrial lineup identifications of Mr. Wiley. According to Mr. Wiley, counsel should have filed a motion based on Mr. Wiley being the only lineup participant who exhibited all the physical characteristics in the witnesses' descriptions of the offender. In the alternative, Mr. Wiley argues that new counsel should have been appointed to further investigate what the witnesses said about the offender's age and how

Desmond described the offender to the police.

¶ 30    Inquiries into a defendant's *pro se* posttrial claim alleging ineffective assistance of trial counsel are governed by *Krankel* and its progeny. *People v. Ayres*, 2017 IL 120071, ¶ 1. The goal of a *Krankel* proceeding is to "facilitate the trial court's full consideration of a defendant's *pro se* claim." *Id*. ¶ 13. A defendant is only required to "bring his or her claim to the trial court's attention," which may be done through a written motion, letter, or note to the court, or orally. (Internal quotation marks omitted.) *Id*. ¶ 11. During the preliminary inquiry, the trial court may reach "not only the factual basis of a defendant's *pro se* claims of ineffective assistance, but also the legal merits of such claims." *People v. Little*, 2021 IL App (1st) 181984, ¶ 46. The purpose of this inquiry is to allow the court to decide whether to appoint independent counsel to argue the defendant's *pro se* ineffective assistance of counsel claim. *Ayers*, 2017 Il 120071, ¶ 11. If the court determines that the "claim lacks merit or pertains only to matters of trial strategy," it need not appoint new counsel and should deny the *pro se* claim. *People v. Roddis*, 2020 IL 124352, ¶ 35. If the allegations show "possible neglect of the case," new counsel should be appointed. *Id*.

¶ 31    Whether a trial court properly conducted a preliminary *Krankel* inquiry is reviewed *de novo*. *Little*, 2021 IL App (1st) 181984, ¶ 48. In conducting the inquiry, the trial court may discuss the facts and circumstances surrounding the allegations with the defendant and trial counsel and rely on "its knowledge of [trial] counsel's performance at trial and the insufficiency of the defendant's allegations." *Ayres*, 2017 IL 120071, ¶ 12. Here, there is no dispute that, on remand, the trial court properly conducted the *Krankel* hearing. The trial court discussed the claim with both Mr. Wiley and trial counsel, and allowed Mr. Wiley to argue his claims at length. Furthermore, the court allowed trial counsel to respond and questioned counsel about his trial decisions extensively, including probing into how counsel challenged the identifications at trial.

Therefore, the court complied with the requirements of a preliminary *Krankel* inquiry.

¶ 32   Mr. Wiley's argument on appeal is that the trial court erred in not finding possible neglect by trial counsel and appointing new counsel based on trial counsel's failure to move to suppress the lineup identification. A trial court's decision declining to appoint new counsel following an adequate inquiry is reviewed for manifest error. *People v. McCarter*, 385 Ill. App. 3d 919, 941 (2008). Manifest error is error that is "clearly evident, plain, and indisputable." *People v. Jackson*, 2020 IL 124112, ¶ 98. We do not find any manifest error in this case.

¶ 33   Allegations of ineffective assistance of counsel are governed by *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail on a claim of ineffective assistance of counsel under the *Strickland* standard, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness; and (2) the deficient performance resulted in prejudice to the defendant. *People v. Manning*, 241 Ill. 2d 319, 326 (2011).

¶ 34   For the first prong, a defendant must overcome a strong presumption that the challenged action or inaction was sound trial strategy. *People v. Elliott*, 2022 IL App (1st) 192294, ¶ 37. Counsel's decision on whether to file a motion to suppress is generally a matter of trial strategy entitled to great deference and, as such, is "generally immune" from a claim of ineffective assistance of counsel. *People v. Rodriguez*, 2022 IL App (1st) 200315, ¶ 114; *People v. Dupree*, 2018 IL 122307, ¶ 44. In this case, Mr. Wiley's trial counsel told the judge at the hearing that he did not file a motion to suppress because he did not believe the identification procedure was unnecessarily suggestive and thought it was a better strategy to challenge the credibility of the identifications at trial through cross-examination. During trial testimony and closing argument, counsel highlighted the witnesses' opportunity to speak to one another prior to making their individual identifications. The court determined that this strategy was not unreasonable. The trial

court properly relied on the fact that trial counsel made a strategic decision not to file a motion to suppress in rejecting Mr. Wiley's claim that there was possible neglect.

¶ 35    In addition, it is unlikely that such a motion would have been successful. To establish that counsel's deficient performance resulted in prejudice under the second prong of *Strickland*, Mr. Wiley would need to show "that the unargued suppression motion is meritorious, and that a reasonable probability exists that the trial outcome would have been different had the evidence been suppressed." *People v. Lobdell*, 2019 IL App (3d) 180385, ¶ 11.

¶ 36    If counsel for Mr. Wiley had filed a motion to suppress, he would have borne the burden of proving that the procedure was "unnecessarily suggestive and created a substantial likelihood of misidentification." *People v. Joiner*, 2018 IL App (1st) 150343, ¶ 39. The individuals selected for a photo array or lineup need not be identical and "differences in their appearance go to the weight of the identification, not to its admissibility." (Internal quotation marks omitted.) *People v. Allen*, 376 Ill. App. 3d 511, 521 (2007). An identification procedure is unnecessarily suggestive when a defendant "is more or less spotlighted by the authorities." (Internal quotation marks omitted.) *People v. Smith*, 2023 IL App (1st) 181070, ¶ 37. Courts consider the totality of the circumstances when reviewing a claim of an unnecessarily suggestive identification. *Joiner*, 2018 IL App (1st) 150343, ¶ 39.

¶ 37    At the *Krankel* proceeding in this case, Mr. Wiley argued that the lineup was unnecessarily suggestive because he was "spotlighted" by being the only lineup participant with the weight, height, skin complexion, and hairstyle as described. Mr. Wiley stated that he was placed in a lineup with men who were shorter and younger—with the oldest being 11 years his junior—and that none of the other men had lighter skin or a shaved or bald head.

¶ 38    We have reviewed a photo of the lineup and do not find it so suggestive that we can say a

motion to suppress it was likely to succeed. At trial, Officer Wallace, who compiled the lineup, testified that the description of the offender he received was a five-foot-nine-inch, 225-pound black male. The photo depicts five black men, all sitting, which minimized their height differences. While there are also differences in terms of skin tone, hair style, and weight, the differences do not "spotlight" Mr. Wiley nor are they so pronounced as to have singled him out from the others.

¶ 39    In addition, as the State argues here, even if a motion to suppress had been filed and was successful, the State would have been permitted to call the three witnesses who identified Mr. Wiley in court because the record showed that those witnesses' prior observations of Mr. Wiley were sufficient to serve as an independent basis for their in-court identifications. *People v. Underwood*, 263 Ill. App. 3d 780, 786 (1994). This, too, undermines any possibility that Mr. Wiley's claim in the *Krankel* hearing demonstrated possible neglect under the required *Strickland* showing.

¶ 40    In short, because the decision not to file a motion to suppress was one of reasonable trial strategy and because such a motion was not likely to succeed—and even if did, was unlikely to change the trial outcome—there was an insufficient basis for suggesting that this claim could have satisfied either prong of *Strickland.* The trial court did not commit error that was "clearly evident, plain, and indisputable" in finding that there was no showing of possible neglect and therefore not appointing Mr. Wiley new counsel for further proceedings. *Jackson*, 2020 IL 124112, ¶ 98.

¶ 41    In the alternative, Mr. Wiley argues that remand is needed so independent counsel can investigate what description Desmond gave of the offender, which is not in the record, as well as the age of the offender as described by the witnesses. We disagree. This is evidence that Mr. Wiley believes might further support his claim that the lineup was unduly suggestive because of

differences between him and the other men with whom he was sitting. But, as we have already recognized, the fact that there were some differences amongst the lineup participants, including age, does not equate to unnecessary suggestiveness. Rather, "differences in their appearance go to the weight of the identification, not to its admissibility," as the participants need not be identical. (Internal quotation marks omitted.) *Allen*, 376 Ill. App. 3d at 521.

¶ 42    Moreover, Mr. Wiley never asked the court below to appoint new counsel for the purposes of doing this further investigation. The trial court's failure to *sua sponte* appoint new counsel to look into possible additional differences between the witnesses' description of the offender and the line-up participants was clearly not manifest error. This alternative argument does not provide any basis for reversing the trial court in this case.

¶ 43    In sum, we conclude that the trial court properly conducted a preliminary *Krankel* inquiry to ascertain the factual allegations surrounding Mr. Wiley's *pro se* claim of ineffective assistance of trial counsel and the court's finding that there was an insufficient showing of possible neglect to require appointment of new counsel was not manifestly erroneous. Mr. Wiley's alternative argument that the trial court should have, without any request to do so, appointed new counsel to further investigate his claim is without merit.

¶ 44                              IV. CONCLUSION

¶ 45    For the foregoing reasons, we affirm the judgment of the trial court.

¶ 46    Affirmed.